**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH FARLEY,** | : | **Civil No. 1:13-CV-858** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

**I.**    **Statement of Facts and of the Case**

    **A.**    **Introduction**

In this action, we are presented with Joseph Farley's appeal of an adverse

decision rendered by an Administrative Law Judge (ALJ), finding that he was not

fully disabled, and, therefore, denying his application for Social Security disability

benefits.

Joseph Farley ("Farley" or the "plaintiff") filed an application for disability

benefits on March 22, 2010, alleging a disability onset date of July 4, 2005.  The

claim was denied initially on August 4, 2010.  Thereafter, Farley requested a hearing.

Michelle Wolff, an ALJ, presided over a hearing in Williamsport, Pennsylvania on

July 19, 2011, during which the plaintiff and a vocational expert (VE) testified. Following that hearing, and a thorough review of the medical evidence of record, the ALJ found that Farley was not disabled under section 216(I) and 223(d) of the Social Security Act.  Accordingly, the ALJ issued a written decision on August 8, 2011, denying Mr. Farley's application for disability benefits.  Farley then initiated the instant action on April 5, 2013, urging the Court to set aside the ALJ's decision and remand this matter to the Commissioner for further consideration.  (Doc. 1.)

Following our review of the record, including the ALJ's decision and the evidence that was before her, for the reasons set forth below, we conclude that the ALJ's decision is supported by substantial evidence which is adequately explained on the record and, therefore, this decision will be affirmed.

### B.    **Farley's Medical and Employment History**

The plaintiff last met the insured status requirements for disability insurance benefits (DIB) on June 30, 2009. (Tr. 113.)  As of that date he was 52 years old.  (Tr. 93.)

Farley completed two years of college and holds an Associate's degree in business. (Tr. 34.)  He spent 13 years in the Navy before being honorably discharged, apparently on the basis of a personality disorder.  (Tr. 34, 90, 376.)  Farley has past work experience as an assembly line worker, which is considered light-semi-skilled

work; and as both a production manager and assistant manager, which are light, skilled positions. (Tr. 55-56, 116.) The plaintiff claims that he left his most recent job as an assistant manager in a food market because of difficulties from a seizure disorder; notably, however, it does not appear that Farley has ever been diagnosed with such a disorder.[1] (Tr. 35-36.) In addition to the foregoing work, Farley has experience as a carpenter, and testified that he has continued to do some limited carpentry and related consulting work since leaving his last job. (Tr. 55-56.)

The plaintiff has been married for 23 years and lives with his wife and adult daughter. (Tr. 32, 145, 376.) He has other grown children residing in Williamsport and Pittsburgh, as well as children from another relationship whom claims are estranged from him. (Tr. 32.) He testified that he cares for his grandchildren as often as four days a week, and he and his wife socialize with friends in their home at least once per week. (Tr. 45-46, 376.) The plaintiff also testified that he drives short

---

[1] It appears that Farley's alleged seizures first became an issue in 2005. In a letter dated May 16, 2005, Stacey Neu, M.D. wrote to a neurologist asking that the plaintiff be re-evaluated for claiming to experience episodic seizures during which he would "zone" for as much as 15 minutes at a time. (Tr. 247.) On May 18, 2006, the plaintiff was seen by Jeffrey Braun, M.D., and notes taken at this time reported that "seizures 5-10 minutes happen quickly." (Tr. 272.) It does not appear, however, that the plaintiff was actually diagnosed with a seizure disorder, although the plaintiff did testify that he had been prescribed some unidentified medication by a neurologist, which the plaintiff admitted to discontinuing because he found that it made him nervous. (Tr. 36.)

distances, shops, cooks, does laundry and light housework, uses a computer, and cares for his personal needs.  (Tr. 33, 47, 164, 376.)  In addition, evidence in the record indicated that during the period the plaintiff claims to have been totally disabled he walked up to three miles per day with "no problems or concerns" in an effort to lose weight, and did "hard physical work" without a problem.  (Tr. 269, 376.) Although Farley represented that his numerous ailments rendered him unable to work, he continued to do some construction work and to help family and friends with carpentry during the period of claimed disability.  (Tr. 34-35, 196, 232, 269, 277.)

### C.   The Plaintiff's Alleged Physical and Mental Impairments

#### 1.   Carpal Tunnel Syndrome

On February 7, 2005, the plaintiff sought treatment for right elbow pain and numbness in his right hand.  (Tr. 263.)  The plaintiff was seen by Jeffrey Braun, M.D. at Grampian Hills Family Medicine.  (Tr. 263.)  During that visit, Dr. Braun observed a lump on the plaintiff's forearm, but otherwise noted that the plaintiff was not in distress and appeared to have a full range of motion with his arm and hand.  (Tr. 264.) In November 2005, it was confirmed that the plaintiff had carpal tunnel syndrome in his right wrist, though he was getting relief from using a splint.  (Tr. 266.)

The plaintiff underwent endoscopic surgery on his right hand in February 2006. (Tr. 188.)  Within a month, the plaintiff had healed, and reported having sensation in

his hands, a reasonable range of motion in his fingers, and excellent grip strength. (Tr. 191-92.)  The surgeon recommended that the plaintiff return to normal daily activities on March 30, 2006.  (Tr. 192.)

Several years later, the plaintiff began experiencing pain in his left hand.  As a result, the plaintiff underwent surgery on August 31, 2009.  During that surgery, Hani Tuffaha, M.D. performed median nerve decompression surgery on the plaintiff's left wrist and observed that the plaintiff tolerated the surgery well.  (Tr. 223-24, 345-46.)  Other notes indicate, however, that the plaintiff has lost sensation in his left hand, and that such loss may be permanent.  (Tr. 443.)  Notably, however, the information about the plaintiff's ongoing left wrist trouble falls more than a year after his date last insured.  Thus, on September 2, 2010, the plaintiff began treating with a Dr. Giordano at Grampian Hills, where the plaintiff had been treated for his right wrist pain.  At that time the plaintiff was advised to see Dr. Tuffaha, his surgeon, to discuss the loss of sensation he claimed to be experiencing.  However, the record indicates that the plaintiff did not see Dr. Tuffaha again and Dr. Giordano did not note any other complaints from the plaintiff about his left hand during any follow-up visits.[2]  (Tr. 443-448.)

_____

[2]  In his brief, the plaintiff seems to intimate that his left wrist trouble in some way should factor into an assessment of his disability claims in this case. Thus, he cites to a treatment note in which it is indicated that the plaintiff had lost

## 2.   **Tinnitus**

In addition, the plaintiff claims to be troubled by tinnitus, or a ringing in his ears.  On April 12, 2006, the plaintiff saw Timothy McCloskey, D.O. for an allergy appointment, but denied having problems with his ears.  (Tr. 196.)  The record is somewhat equivocal regarding the extent of the plaintiff's hearing difficulty, though he was diagnosed in March 22, 2009, with noise induced high-frequency hearing loss and associated tinnitus. (Tr. 306-07.)  Even with that diagnosis, however, the medical evidence provided little support for the plaintiff's claim that his tinnitus was disabling.   Thus, in April 2006, the plaintiff's auditory canals were found to be normal, as was his hearing. (Tr. 197.)  Nearly three years later, in February 2009, the plaintiff underwent an MRI of his brain after he was complaining of ringing in his ears. (Tr. 255.)  This MRI revealed normal findings. (Tr. 255.)  On March 16, 2009, the plaintiff was referred to Joel D'Hue, M.D., an otolaryngologist. (Tr. 306.)  Dr.

---

sensation in his left hand, which may have been permanent.  (Doc. 9, at 4 and 9.)
The plaintiff suggests that it was error for the ALJ to have assumed that the
surgery on the plaintiff's left wrist was successful, or to fail to find that the
plaintiff was so limited in the use of his left hand that he would effectively be
precluded from a number of different jobs.  (Id. at 9.)  However, the evidence
regarding this particular alleged ailment and the plaintiff's lack of follow-up
treatment was especially limited.  (Tr. 37.)  Moreover, aside from a stray note
urging follow-up treatment, there is nothing in the record other than the plaintiff's
own testimony about some of the limitations he has experienced with his left hand.
(Tr. 37, 443-48.)

D'Hue found the plaintiff's ear-nose-and-throat (ENT) examination to be "entirely unremarkable." (Tr. 306.) Dr. D'Hue conducted a hearing test on March 22, 2009, and at that time diagnosed tinnitus. (Tr. 306.) Other readings taken during this examination were found to be normal. (Tr. 307.) Dr. D'Hue recommended that the plaintiff take vitamin B, and suggested that at some point he might need auditory amplification, but that it would be some time before this would be necessary. (Tr. 307.) In April 2010, the plaintiff's primary care doctor confirmed the plaintiff had tinnitus, but otherwise found that the plaintiff's hearing was "grossly intact" and his tympanic membranes were normal. (Tr. 232-33.) The plaintiff's hearing was found to be normal during all follow-up visits. (Tr. 225-298.)

### 3.   <u>Alleged Seizure Disorder</u>

In addition to carpal tunnel syndrome and tinnitus, the plaintiff also claimed to suffer from a seizure disorder that would cause him to suffer episodic seizures during which he would "zone out" for several minutes at a time. The medical evidence, however, provides little in the way of direct support for this claim. The plaintiff voluntarily stopped working in 2005, claiming that his seizures were interfering with his ability to perform his job. (Tr. 35.) The plaintiff's primary care physician, Dr. Tanner, referred the plaintiff to a "Dr. Yanofsky" for an evaluation, but the record is devoid of medical records from Dr. Yanofsky, and we can find little

evidence that the plaintiff actually sought treatment for his alleged seizures.  There is evidence that in May 2007, the plaintiff told Dr. Tanner that he had seen Dr. Yanofsky and had been prescribed some unidentified medication, but then discontinued using it because he did not like the side effects it caused.  (Tr. 277.) During this visit, Dr. Tanner found that the plaintiff's neurological examination was normal, and the plaintiff denied having a history of dizziness, seizures, loss of function or sensation.  (Tr. 278.)  Furthermore, the plaintiff told the ALJ that he was no longer pursuing treatment for the alleged seizures.  (Tr. 37.)

### 4.   Back Pain

The plaintiff also suffers from back pain due to degenerative disc disease and retrolisthesis.  Nevertheless, in April 2006, less than a year after he had stopped working, the plaintiff was examined by Dr. Timothy McCloskey and reported that he felt good and was actually working as a self-employed carpenter. (Tr. 195.)  During this appointment, the plaintiff denied having musculoskeletal issues, and he had a normal gait.  (Tr. 196-97.)  Two months later, on June 25, 2007, the plaintiff again told Dr. McCloskey that he was not experiencing significant joint or muscle pain. (Tr. 198.)

In early 2008, however, the plaintiff had an x-ray of his lumbar spine and was diagnosed with degenerative disc disease and retrolisthesis at L5-S1.  (Tr. 254.)  Dr.

Tanner, the plaintiff's primary care doctor, recommended that he pursue physical therapy. (Tr. 254.) On May 4, 2009, the plaintiff had a follow-up MRI, which revealed posterior disc bulge with slight narrowing of the foramina bilaterally at L5-S1 and degenerative disc disease. (Tr. 256.) However, no significant foraminal narrowing of the spine was shown, and there was no visible disc herniation, subluxation, or fracture. (Tr. 256.)

On August 31, 2009, the plaintiff saw Dr. Tuffaha, the neurosurgeon, for pain in his lower back, legs and wrist. (Tr. 221-22, 345-46.) During this appointment, Dr. Tuffaha found the plaintiff's gait to be normal and that his straight-leg raising test was normal to 90 degrees. (Tr. 221.) At the same time, Dr. Tuffaha reviewed the plaintiff's MRI results and concluded that the plaintiff's subjective complaints of pain were not supported by the objective medical evidence. (Tr. 221.) Additionally, Dr. Tuffaha found that the plaintiff's back condition did not require surgery, but instead recommended only that the plaintiff engage in physical therapy and begin taking medication, including non-steroidal anti-inflammatory drugs (NSAIDs) and a muscle relaxer to treat the lower back pain. (Tr. 222.) Dr. Tuffaha did recommend that the plaintiff undergo surgery for his carpal tunnel syndrome, which the plaintiff did. (Tr. 222.)

Correlating with Dr. Tuffaha's findings, the medical providers at Grampian Hills Family Medicine, including Drs. Rebekah Tanner, Stacey Neu, Jeffrey Braun and, later, Guy Giordano, all found on multiple occasions the following normal findings: the plaintiff's gait was normal; his range of motion in all joints was normal; and he had normal muscle strength. (Tr. 259, 261, 258-69, 272, 279, 281-81, 289, 290.) These doctors also adhered to a conservative treatment plan for the plaintiff's claimed ailments, and prescribed only NSAIDs such as Valtaren and Diclofenac, to treat the plaintiff's claims of back pain between March 2, 2009, through April 23, 2011. In 2010, the plaintiff told Dr. Tanner that after taking NSAIDs he found he was able to work for a few hours. (Tr. 232.) In September 2010, the plaintiff reported that he was only treating his back pain with Voltaren gel. (Tr. 181.)

### 5.   **Mental Health Impairments**

In addition to his alleged physical impairments, the plaintiff has also represented that he suffers from certain mental health challenges, in particular depression and personality disorder. However, the evidence supporting this assertion is somewhat equivalent. Thus, on April 12, 2006, the plaintiff was seen by Dr. McCloskey for allergies, and at that time denied having any mental health problems, including depression. (Tr. 196.) However, three years later, the plaintiff pursued treatment for one month with Family Services, alleging depression, obsessive-

compulsive disorder, and personality disorder.  (Tr. 452-71.)  During his initial examination, despite the plaintiff's reports that he felt depressed, the examining therapist found that he was alert, his speech was normal, his behavior and appearance were unremarkable, and his had no symptomatic thoughts.  (Tr. 469.)  During only six counseling sessions, the plaintiff's Global Assessment of Functioning (GAF) scores improved from 65 to 68.[3]  (Tr. 471.)

The plaintiff is reportedly now taking Prozac, which he attested his helping him "quite a bit".  (Tr. 41-43.)  For that reason, the plaintiff testified that he is no longer in need of additional treatment for his alleged mental impairments, and he ended his treatment with Family Services.  (Tr. 43.)  In another positive development for the plaintiff, during his check-up with Dr. Tanner in May 2010, the plaintiff reported that his family had noticed an improvement in his mood since he began taking medication, and he indicated that he was experiencing fewer side effects from his medication. (Tr. 440.)

### D.    Consultative Examinations and Opinion Evidence

---

[3] A GAF between 61 and 70 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  The Am. Psychiatric Association Diagnostic & Statistical Manual of Mental Disorders, 32 (4th ed. 1994).

On July 6, 2010, consultative examiner, Craig Neilson, M.D., examined the plaintiff. (Tr. 375-85.)  During this examination, Dr. Neilson found the plaintiff to be alert, oriented and pleasant. (Tr. 376.)  The plaintiff did not appear to be depressed and did not exhibit unusual or inappropriate behavior.  (Tr. 376.)  Dr. Neilson found that he communicated clearly, he followed directions, and he related well to the doctor.  (Tr. 377.)

With respect to his physical mobility, the plaintiff moved around the room without difficulty, was able to heel-toe walk, squat and un-squat, and get on and off of the examination table without apparent difficulty.  (Tr. 377.)  The plaintiff had a negative straight-leg raising test both lying down and sitting down.  (Tr. 377.)  When the examination was over, Dr. Neilson found that the plaintiff walked with an even and normal gait and descended the steps without difficulty.  (Tr. 391.)

In terms of his fine motor skills, the plaintiff exhibited "fine and dexterous motion" in all of his fingers, though he had numbness in his left hand.  (Tr. 377, 391.)  The plaintiff's range of motion in his hips, spine, neck, ankles, shoulders, elbow, wrists, hands, and fingers were normal, and he had normal grip strength.  (Tr. 380-83.)  Following the exam, Dr. Neilson found that the plaintiff had no limitations with respect to his ability to lift, carry, stand, walk, sit, push, or pull.  (Tr. 383-84.)

On July 13, 2011, Dr. Rebekah Tanner, the plaintiff's primary care doctor, filled out a "Physical Capacity Evaluation" form on which she indicated that the plaintiff could only lift up to 10 pounds; could stand, walk or sit for two to four hours in an eight-hour workday; and could only drive an hour or less. (Tr. 450.) Dr. Tanner also found that the plaintiff should avoid grasping, fine manipulation, pushing and pulling, and rotation in his hands, and should refrain from bending, squatting, carrying, stooping, twisting, and kneeling.  (Tr. 450.)

Another of the doctors with Grampian Hills, Guy Giordano, also provided an opinion letter addressing the plaintiff's functional limitations.  (Tr. 438.)   Dr. Giordano opined that the plaintiff had chronic back pain and, curiously, osteoarthritis; another of the plaintiff's former doctors had previously informed the physicians at Grampian Hills that the plaintiff did not have arthritis. (Tr. 438, 369.)  Dr. Giordano represented that mild exertion would cause the plaintiff pain, and stated that he must work slowly and with frequent breaks in order simply to get through daily activities. (Tr. 438.)  Dr. Giordano testified that even light exertional work would cause the plaintiff to be "immobilized by pain."  (Tr. 438.)

Lastly, a state agency psychologist, Mark Hite, Ed.D, reviewed the plaintiff's medical records and was unable to render a decision regarding the plaintiff's alleged

mental impairments, noting that there was insufficient evidence as of the plaintiff's

last date insured.  (Tr. 404.)

### D.    Vocational Expert Testimony and the ALJ's Decision

During the hearing in this matter, Carmeen Abraham, a vocational expert (VE)

reviewed the relevant evidence in the record and testified.  (Tr. 54-59.)  The ALJ

asked the VE to consider the plaintiff's age, education and work experience, as well

as being limited to light work with postural limitations.  (Tr. 55-56.)  Based upon

these factors and express limitations, the VE testified that the plaintiff would remain

capable of performing his past relevant work of a production manager, assembly line

worker, and assistant manager.  Based in part upon this testimony, the ALJ found that

the plaintiff was not under a disability from July 4, 2005, through June 30, 2009, the

date last insured, and denied his request for benefits.  (Tr. 22-23.)

### II.    Summary of the Plaintiff's Claims in this Case

The plaintiff alleges several challenges to the ALJ's decision.  First, the

plaintiff contends that it was error for the ALJ to have failed to find that the plaintiff's

left hand carpal tunnel syndrome, seizure disorder, tinnitus, and

depression/personality disorder were severe impairments.  The plaintiff next claims

that the ALJ erred by "rejecting" the opinions of his treating physicians, (Doc. 9, at

8), and improperly analyzed the medical evidence in the record.  Finally, the plaintiff

disputes the ALJ's finding that he was capable of returning to his past relevant work.

Following a thorough review of the entire record taken during these

proceedings, we find no merit to the plaintiff's arguments regarding the ALJ's

decision, and find that the ALJ's decision to deny the plaintiff's claim for benefits

was supported by substantial evidence and will be upheld.

**III.**   **Discussion**

**A.**   **Standards of Review–The Roles of the Administrative Law Judge
and This Court**

Resolution of the instant social security appeal involves an informed

consideration of the respective roles of two adjudicators–the Administrative Law

Judge and this Court.  At the outset, it is the responsibility of the ALJ in the first

instance to determine whether a claimant has met the statutory prerequisites for

entitlement to benefits.  To receive disability benefits, a claimant must present

evidence which demonstrates that the claimant has an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Furthermore,

[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits.  See 20 C.F.R. § 404.1520.  See also Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  If the ALJ finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  See 20 C.F.R. § 404.1520.  As part of this analysis the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  See 20 C.F.R. § 404.1520.

This disability determination also involves shifting burdens of proof. The initial burden rests with the claimant in steps 1 through 4 to demonstrate that he is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Com. of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding. In undertaking this task, this Court

17

applies a specific, well-settled and carefully articulated standard of review.  In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review.  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, we must simply determine whether the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); see also Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)."  Johnson, 529 F.3d at 200.  See also  Pierce v. Underwood, 487 U.S. 552 (1988).  It is less than a preponderance of the evidence but more than a mere scintilla of proof.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)(quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

18

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

**B.    The ALJ's Decision Was Supported By Substantial Evidence**

Judged against this deferential standard of review we find that the ALJ's disability decision in this case was supported by "substantial evidence" and, therefore, may not now be disturbed.   Indeed, given the many conflicting and contradictory threads in the evidence presented to the ALJ, this ruling reflects a thorough, careful, balanced analysis of the proof.

1.    **The ALJ's Determination that a Number of the Plaintiff's Claimed Physical and Mental Impairments Were Not Severe Was Supported by Substantial Evidence and Even if this Conclusion Was Erroneous, any Error was Harmless**

The plaintiff devotes considerable effort to arguing that the ALJ erred when she concluded at step two of the sequential analysis that the plaintiff's alleged tinnitus, carpal tunnel syndrome, seizure disorder, and depression/personality disorder were not severe impairments.  The plaintiff relies on cases standing for the proposition that the evaluation of an impairment at step two is a *de minimus* test that is designed to weed out frivolous claims, and is "not an exacting one."  McCrea v. Comm's of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).

It is true that "[t]he burden placed on an applicant at Step 2 is not an exacting one."  Id.  This is because the Commissioner has concluded "that an applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's

ability to work.'" Id. (citing SSR 84-28).  However, in McCrea, the Third Circuit Court

of Appeals was emphasizing that ALJs should be careful not to end an evaluation of

claimant's claims at step two prematurely, except in cases where a claim clearly lacks

merit.  In this case, that did not happen.  To the contrary, the ALJ considered – and,

indeed, explained in more than two pages of her decision – the plaintiff's claimed

ailments, and explained in detail why she found that the evidence did not support a

finding that many of the impairments were severe.

Furthermore, and importantly, the ALJ did not end her analysis at step two;

instead, she proceeded through each step of the five-step sequential process, and

analyzed the plaintiff's overall residual functional capacity at step four before

concluding that he remained capable of engaging in light work with some postural

limitations.  Thus, even if the Court were to find that the ALJ erred in excluding the

plaintiff's alleged tinnitus, carpal tunnel syndrome, seizure disorder, and mental health

limitations as "severe" impairments at step two, this error would be harmless because

the ALJ found that the plaintiff had severe impairments with respect to his chronic back

pain and degenerative disc disease, and, therefore, proceeded through the entire five-

step evaluation process on the basis of both the plaintiff's severe and non-severe

impairments.  See e.g., Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d

Cir. June 26, 2007) (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005));

Barnett v. Astrue, Civ. A. No. 07-cv-1036, 2008 WL 5114266, *7 (W.D. Pa. Nov. 25, 20008).   The plaintiff's reliance upon McCrea, therefore, is unpersuasive and any alleged error in her findings at step two would in any event be harmless, given that the plaintiff's claims were analyzed at each successive step regardless of the fact that many of his claimed impairments were not found to be severe.

Furthermore, review of the ALJ's detailed opinion at step two makes clear that her decision was supported by substantial evidence.   Thus, the plaintiff claims that he suffers from a seizure disorder, and indeed he posited this alleged disorder as one of the principal reasons he left his last job.   Yet, the medical evidence simply does not support his claims here.   The only neurological testing performed, at least according to the record evidence, was an MRI of his brain in 2009, and this was found to be normal.   (Tr. 255.)   The plaintiff testified subjectively that he "zoned out," but also admitted that he was not seeking any treatment for the alleged seizures.   (Tr. 37.)   The plaintiff's primary care doctors noted repeatedly that his neurological examinations were normal.   Against these normal findings, the plaintiff's unsupported and subjective claims that he suffers from "seizure disorder" is just not sufficient.   Likewise, the plaintiff's statement that "there is nothing to contradict his testimony that he continues to suffer from these episodes once or twice a week," (Tr. 36.), is simply wrong, both because it is the plaintiff who bears the burden of establishing his claims, but also

because the record evidence that the plaintiff's neurological functioning was normal substantially undermines his own unsupported assertions of an impairment.[4]

With respect to the plaintiff's carpal tunnel syndrome, the ALJ found that it had been successfully treated with surgery in 2009, and there was evidence in the record to support this finding.  (Tr. 17, 223-24, 245-46.)  That evidence showed that Dr. Tuffaha had performed median nerve decompression surgery on the plaintiff's left wrist and indicated that the plaintiff had tolerated the surgery well.  (Tr. 223-24, 345-46.) Other evidence showed that the plaintiff had told his primary care doctor that he was improving, and she noted that he was "doing well" after the surgery.  (Tr. 238-39.) Other physical examinations, including Dr. Neilson's examination, showed that the plaintiff's impairment was less severe than alleged, and that he had no inflammation or wasting of the muscles in his left hand, and retained full range of motion in his wrists, hands, and fingers, with normal grip strength.  (Tr. 377-383.)

---

[4] We thus acknowledge the Commissioner's secondary argument that the ALJ actually would have been justified in this case in dismissing that the plaintiff's seizure disorder as a non-medically determinable impairment.  20 C.F.R. § 404.1508; SSR 96-4p (providing that a medically determinable impairment is one that is supported by medical evidence consisting of clinical signs and laboratory findings).  There was some suggestion that the plaintiff was treating with a physician who had prescribed medication in response to his claims of "zoning out", but there is no actual medical evidence in the record to support a diagnosis.

23

Regarding the plaintiff's mental health impairments, the ALJ's conclusion was also supported by substantial evidence, including the fact that the plaintiff testified that he no longer needed therapy to deal with depression and anger since his medication regimen was helping him greatly. (Tr. 42-43.) Moreover, the plaintiff's GAF scores had suggested, prior to him being medicated, that he was functioning fairly well, and he had engaged in very limited and conservative treatment. (Tr. 452-71.) The ALJ was presented with a record that did not objectively support the plaintiff's claims that his mental health impairments were severe.

Thus, the ALJ's findings that the plaintiff's claimed tinnitus, carpal tunnel syndrome, and mental health disorders were non-severe at step two was supported by substantial evidence, but even if the ALJ erred in her findings in this regard, such error was harmless because she found other severe impairments, and, therefore, continued to consider the plaintiff's claimed impairments at step four when she determined his residual functional capacity. Thus, we find no error.

## 2.   The ALJ Properly Weighed the Opinion Evidence

Next, the plaintiff contends that the ALJ erred by rejecting the opinions of Drs. Tanner and Giordano, the plaintiff's treating physicians. (Doc. 9, at 10-12.) This argument is unpersuasive, most particularly because the ALJ did not reject the opinions, but instead accorded them little weight because the opinions were not

supported by objective medical evidence and, in a number of ways, were actually cast into doubt by that evidence.

As the Commissioner rightly notes, any opinions regarding whether a claimant is fully disabled, or on other ultimate issues that are reserved to the Commissioner, are never entitled to controlling weight. 20 C.F.R. § 404. 1527(d)(1). Additionally, the ALJ is required to evaluate the medical opinions in order to determine the weight that the deserve based upon the record in a given case. 20 C.F.R. § 404.1527. Factors that will help inform an ALJ's evaluation of an opinion include whether the physician giving the opinion treated or examined the claimant; whether the opinion finds support in medical or laboratory findings; and whether the opinion is consistent with the opining physician's own treatment records, and with the overall record. 20 C.F.R. § 404.1527(c)(1)-(4). Thus, although a treating physician's opinion is often entitled to "great weight," particularly when based upon continuing observation of a claimant's condition over a prolonged period of time, Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), an ALJ may reject a treating physician's opinion if it is contradicted by medical evidence, or may afford it more or less weight depending upon the extent to which the opinion is explained. Id. (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)). Furthermore, determination of whether a claimant is disabled and the extent of his residual functional capacity are reserved exclusively to the Commissioner,

and thus treating physicians' opinions regarding these ultimate issues are "never entitled to controlling weight or special significance." 20 C.F.R. § 404.1527(d); SSR 96-5p.

In this case, the plaintiff proffered opinion evidence from two of his primary care doctors, Drs. Rebekah Tanner and Guy Giordano. The ALJ considered these opinions, even though they were rendered beyond the relevant time period of the plaintiff's claimed period of disability. (Tr. 22.) Contrary to the plaintiff's contention, the ALJ did not reject the opinions, but instead gave them limited weight, since she found that some of the conclusions the doctors reached were unsupported by and inconsistent with other objective medical evidence of record. (Tr. 22.)

For example, Dr. Tanner opined that the plaintiff could perform only sedentary work, but this conclusory opinion was fairly undercut by the plaintiff's admission that he had been engaged in carpentry and construction throughout the relevant period. (Tr. 34-35, 232, 269, 277, 288.) Likewise, her opinion that the plaintiff could sit, stand or walk for no more than two to four hours was seemingly discredited by the plaintiff's admission that he could walk for three miles daily and engage in hard physical work, and by evidence showing that the plaintiff had a normal straight-leg raise, a normal gait, and did not need assistance with ambulation. (Tr. 196-97, 221-22, 269, 377, 391.)

26

Furthermore, Dr. Tanner's opinion that the plaintiff even lacked the ability to use his hands to work was undermined by the plaintiff's acknowledged activities of daily living, which included using his hands for a number of different activities, including carpentry, cooking and using a computer. (Tr. 47-48, 376.) Other medical evidence in the record showed that the plaintiff had a full range of motion in his hands and fingers, and that he had normal grip strength. (Tr. 375-79.) This evidence supports the ALJ's decision to give limited weight to Dr. Tanner's restrictive opinion.

Additionally, although the plaintiff urges this Court to make a finding that Dr. Neilson was biased and, therefore, Dr. Nielson's findings should be discounted in this case, we note that Dr. Neilson's consultative findings, which diverged significantly from Dr. Tanner's very restrictive opinion, were consistent with the other objective medical evidence which showed that Farley could walk for three miles daily, engage in hard physical work, had a normal gait, and did not need assistance with ambulation. (Tr. 196-97, 221-22, 269, 377, 391.) Consistent with this other objective medical evidence, Dr. Neilson found the plaintiff had a full range of motion in his hips, back, and legs; that he had a normal gait, and could ambulate without difficulty. (Tr. 375-79.) In short, this consultative examination, taken in concert with the other objective medical evidence, including medical records from Grampian Hills where Dr. Tanner worked, supported the ALJ's decision to afford Dr. Tanner's opinion limited weight.

27

We also agree with the Commissioner that the ALJ had ample basis to discount the opinion of Dr. Giordano, who claimed that the plaintiff would be precluded even from engaging in light exertional work, since it would cause the plaintiff to be "immobilized with pain." (Tr. 22, 438.)  This fairly extreme opinion is difficult to reconcile with the plaintiff's own admissions that he was fully able to engage in daily shopping, caring for his grandchild throughout the week, and to perform carpentry work, even on a limited basis.  (Tr. 34-35, 45-46, 269, 277, 376.)  Likewise, Dr. Giordano's opinion about the immobilizing pain that the plaintiff's condition would cause if he engaged in light work finds little if any support in the objective medical records, which again showed normal straight-leg raise, normal gait, full range of motion, good grip and muscle strength, and an MRI that showed no significant foraminal narrowing of the spine, no disc herniation, and no subluxation or fractures. (Tr. 254.)

Furthermore, as the Commissioner underscores, Dr. Giordano's opinion is not only undermined by the plaintiff's admitted activities of daily living and other objective medical evidence in the record, but also by the fact that it was given almost two years after the plaintiff's date last insured.  Indeed, Dr. Giordano did not even begin to treat the plaintiff until almost a year and a half after the date last insured.  (Tr. 442.) Accordingly, the opinion, which is already somewhat limited due to its conflict with

other objective medical evidence and the plaintiff's testimony, is not particularly relevant since it does not relate to the applicable time period in this case.

For the foregoing reasons, we decline the plaintiff's invitation to find that the ALJ erroneously evaluated the medical opinion evidence provided by the plaintiff's treating physicians.  Instead, recognizing that the "substantial evidence" standard of review prescribed by statute is a deferential standard of review, Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), which is met by less than a preponderance of the evidence but more than a mere scintilla of proof, Richardson v. Perales, 402 U.S. 389, 401 (1971), we find that the ALJ's decisions assessing this competing proof was supported by substantial evidence and may not now be disturbed on appeal.

### 3.    The ALJ's Finding that the Plaintiff Could Return to His Past Work  is Supported by Substantial Evidence

Finally, the plaintiff endeavors to discredit the ALJ's reasoned opinion by suggesting that she engaged in unwarranted medical analysis that lacked support in the record, and that she erred by concluding that he could return to his past relevant work as a production manager, assembly line worker, or assistant manager.  We disagree.

The objective medical evidence supported the ALJ's conclusion that the plaintiff retained the residual functional capacity to engage in light exertional work, and thus the ALJ's finding that the plaintiff could continue to engage in his past relevant work that was light duty was entirely appropriate.  The plaintiff insists that his myriad

impairments were severe, or otherwise interfered with his ability to perform any work, but he has failed to demonstrate that the record evidence supports this assertion. As discussed above, the ALJ considered all of the relevant evidence when determining the plaintiff's residual functional capacity at step four. This satisfied the ALJ's obligation at this step of the analysis. See 20 C.F.R. §404.1527; Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001). The objective medical evidence supported the conclusion that the plaintiff could engage in light work, since his impairments and resulting symptoms were either not nearly as severe as he alleged, or were otherwise well managed and controlled with medication and very conservative treatment. Moreover, the plaintiff admitted that he had continued to engage in some carpentry work after he left his last job, and during the period of claimed disability, something that would generally be characterized as medium-duty work under the Department of Labor's Dictionary of Occupational Titles. See DICOT 860.381-22. We do not find the ALJ's analysis at this stage of the evaluation to be lacking; to the contrary it is a well supported and sensible conclusion given the lack of evidence supporting the plaintiff's claims of disabling impairments, and the objective evidence and the plaintiff's own admissions showing that he retained the ability to do at least light exertional work.

IV.   **Conclusion**

For all of the foregoing reasons, upon consideration of the parties' briefs and the entire record of the administrative proceedings in this matter, and finding that the ALJ's decision to deny the plaintiff's claims for disability benefits was supported by substantial evidence, the plaintiff's claims in this action will be denied.  A separate order will issue.

*/s MARTIN C. CARLSON*
Martin C. Carlson
United States Magistrate Judge

Dated:   October 2, 2014